Thank you. Good morning, Your Honors, and welcome, Judge Block. May it please the Court, Alan Diamante for Petitioners. The main issues in this case are whether Petitioner's testimony was credible and whether there was sufficient evidence to overcome their burden to show past persecution. The Court must independently evaluate each ground cited by the IJ for its adverse credibility findings. It must be supported by substantial evidence and must go to the heart of the claim of persecution for the Court to accept the findings. Well, you do have the difference between 1981 and 1991. That seems pretty relevant to me because it goes directly to his status, doesn't it? Well, I do not believe that's material, Your Honor, and I'll explain. With respect to the false statements that were provided to the asylum officer, the false statements were that he was in the military until 1991, when in fact it was 1981, and that he was involved in combat with the Shining Luminoso in Ayacucho, when in fact he wasn't involved in combat. He was stationed there, and his duties were to be a guard, but not that he was in combat. Now, assuming that he was in the military, but whether he was in the military in 1981 or 1991, that doesn't make a difference. We do have objective evidence that shows that he was in the military until 1981. However, that's not to the heart of the claim because the heart of the claim has to do with past persecution. It has to do with how he was persecuted. His status is not at all relevant? Your Honor, it is relevant because the status that he was ex-military, that is relevant. Whether the date was 1981 or 1991 shouldn't be relevant here. It doesn't go to the heart. Well, what do we do with his admission? And I'm looking at ER 171 and 172. So you told the asylum officer things that you knew were not true. Is that correct? Yes. Yes, Your Honor. He's admitting that he lied. That's correct. He was candid with the judge. So why should we confine that answer to meaning that he simply lied about the inconsistency in the dates? Why can't the finder of fact say, if the witness admits that he's committed perjury, then I choose to disregard his testimony entirely because he's not a credible witness? Well, the court must consider all the circumstances and all the evidence. And the judge indicated in this case that he failed to adequately and credibly explain himself. And this was his explanation. He said he was nervous. He said he felt that he was unconscious for a lack of eloquence on his part. He said that someone helped him fill out the application, somebody that wasn't an attorney, and that he discovered after the fact that it was riddled with mistakes. Now, there's no evidence in the record here that the asylum officer told him, you can make amendments to your application before you take the oath. He went to the interview, he swore to tell the truth, and he lied. What did he do? Well, the matter was denied before the asylum officer, referred to the court, and once he hired an attorney in proceedings before the judge, he amended his application, gave an explanation, provided a declaration for the court. But we couldn't get past that. The court focused on the asylum interview and didn't consider all the other evidence that was provided. He was candid with the court. Excuse me. Will you explain for me why 1991, the date that he apparently came to this country, is not relevant as to ascertain what his status was, whether he's considered to be a military person or a former military person as of 1991? I just don't get a grasp of that. Maybe you can help me out. Your Honor, if I may, the issue was whether he said he was in the military until 81 versus 91. With the asylum officer and with the original asylum application, which was prepared by the other individual, it indicated 91. But if he's there from 91, that means his status was still as a military person, and he doesn't qualify in terms of, you know, his political beliefs. Right. But there was objective evidence in the record indicating that he was there until 1981. Also, let's keep in mind, assuming that we cannot really trust what he had to say, his wife also testified, and she buttressed everything that he said. And there was no decision by the judge that she was incredible in her testimony. Where does the law say that the I.J. has to make a separate credibility determination in respect to each and every other person who testifies in support of an application? Well, Your Honor, there was a case where it was a case before the Board of Immigration Appeals, and this was a case, I think it was a matter of S.A., in term decision 3433, it's a BIA case from the 2000, where the testimony of an aunt was deemed credible. And that was enough to bolster the claim made by the respondent in that case. The problem you've got here is that one of the first questions that she is asked at ER 179, after they've established that she sat in the courtroom and listened to her husband testify, do you disagree with any part of your husband's testimony? And her answer, I agree with everything. So if the fact finder catches the husband in lies, and his wife corroborates those lies by saying they're all true, why does the finder of fact have to believe her any more than he believed him? Well, Your Honor, we have to put this in perspective. She was making reference to the testimony provided to the judge, not to the asylum officer, which was outside of the proceedings. Which would have to include the fact that my husband lied under oath the last time he testified. Well, Your Honor, basically there was an admission made here. He admitted he was candid with the court on what had happened, and he gave an explanation. The problem, counsel, is that when a witness lies under oath the second time, we are now in that wonderful conundrum that every cross-examiner loves to catch a witness in, were you lying then or are you lying now? That's understandable. And how does that compel our conclusion that the fact finder was wrong when he discredited the testimony of witnesses who admitted under oath that there were lies? Well, Your Honor, we can't go beyond the record. So we don't know, aside from what's in the record, whether the, and I point this out, whether the asylum officer told him that, you know, you can make amendments to your application at this time before you swear to everything that's in it. Now, this might seem, let's say, odd for somebody who's educated like us, but for an individual from another country who's in an asylum interview, he doesn't have an attorney with him, I think this was very important. And he was very nervous, didn't know what to do. He was in a bind. Somebody prepared an asylum application, he discovers after the fact that there's errors in it, and what does he do? He feels like he's damned one way or the other. So had he been with an attorney, he could have easily been informed that he could easily make the amendment and then swear to the changes.  or some documentation from the officer indicating that that was specifically done. So this is regarding the... The portions that I read to you where he admitted that, that was on cross-examination by the DHS counsel, was it not? I believe so, Your Honor. So his lawyer didn't put him on the stand and right out of the box on direct examination, ask him to clarify those prior lies. That information was provided in the form of a declaration, an amended declaration that was provided in the court record, which is part of the evidence. No, but I'm talking about the admissions that he lied. That came out on cross-examination after he had been tendered to the government counsel. Well, I believe that is correct. I believe that the government in cross went into greater detail as to what happened in the asylum interview. That is correct. But it doesn't mean that my client was not candid, that the petitioner was not candid in responding to the court's queries or to the government counsel's queries. I think the big issue here was whether he had adequately or credibly explained himself. And, you know, he wasn't eloquent, but if you look at all the circumstances, you could easily understand why he did what he did. And it didn't help his claim. It didn't really help his claim the fact that it was 91 or 81. If anything, it probably hurt his claim. All he really needed to show that he was in the military, which I don't think there's any dispute to that, that he was stationed in Ayacucho at the time, and I don't think there's any question of that. So then the threats. Let's look at the evidence regarding the threats, the reason why he has fear of going back. Wasn't there a discrepancy between his claims as to what he did in Ayacucho? At one point he said, I was simply a guard in the town, and then later on, no, I was actually involved in skirmishes and fighting. And I fired my gun, but it was only in the air. I didn't shoot anybody. Right. That was the issue that he had in the original application that indicated in the original application that he was involved in some sort of a skirmish. However, he candidly admitted in court that I wasn't involved. I was stationed there for two years, and this is what I had to do. Here's the problem. You've got an I.J. who hears, yes, I fought the Shining Path. Oh, no, I didn't fight the Shining Path. What's the I.J. going to do? Well, he's stating now that he didn't fight the Shining Path. Well, the question is whether fighting the Shining Path or not made a difference in his claim. And it didn't, whether the Shining Path believed that he was a threat to them or whether he was just military. This is the issue. I think we understand your position, counsel. Your time has expired. Thank you, Your Honor. We'll hear from the government. I'm afraid to ask you a question right away, so let me say the first word. Okay. Again, this is Alison Drucker representing the United States. So tell me about corroboration. When do you think under the law it would be necessary for an I.J. to make a separate credibility assessment of a corroborating witness? So you're talking about perhaps the wife? Well, in this case it's the wife, but as a general proposition first, does the law require an I.J. to make separate credibility assessments when other people testify and corroborate somebody's testimony? I think that that might be the case. But I think here where the wife has said that she agrees with everything that the husband said and there are these intrinsic inconsistencies in the husband's evidence, that's a problem. So you agree with Judge Kalman that under these circumstances it was not necessary for the I.J. to do that. Right. I think that's right. Now, there are other circumstances it might have been necessary. I think that's right. And I think here, I mean, the questions, I mean, who has more information about what happened in terms of his military service and what happened with the Shining Path than the petitioner himself, whose testimony is in question and seems to be inconsistent. Now, as came out in some of the questions that have just been asked by the court, there are a number of areas of discrepancy or inconsistency, not just about when the petitioner left service, whether it was 81 or 91, but also when threats began. At one point, Administrative Record 140-43, he said in 1988, only after his brother was killed and after he left the military did the threats begin. And then in dealing with, on cross and dealing with the asylum officer's testimony at AR-169, he said the threats began before he left the military. And the IJ, you know, picked up on that, just as the IJ picked up on the 81-91 discrepancy. Now, another discrepancy that's already been mentioned here by the court is this question about contact with the Shining Path. And again, the IJ picked up on that. Counsel, the essence of your opponent's argument is that these don't go to the heart of the matter. What's your response? My response to that is that they definitely do, that this is extremely material, because one of the things that he has to show to make out a case that the Shining Path are trying to persecute him is that they have a willingness to harm him. And I think that the dates in question pertain to that, the question of whether they started threatening him while he was in the military or at a considerably later time are related to that, and particularly what contact that he had with them when he was in the military. Was it significant? Was he trying to kill them, or did he in fact have no contact? Has something to do with the willingness of them to pursue him and harm him? So I think that's very relevant. And there are some cases, I believe, in this circuit that go to this question of willingness. Lim was cited in our brief at page 26. Also Kaiser v. Ashcroft, 390 F. 3rd at 653, and Hoxha v. Ashcroft, 319 F. 3rd, 1179. Are those cases in your brief? The last two are not, Your Honor, just Lim. Under our rules, before you leave the courtroom, give those citations to the deputy clerk and triplicate and one to your opponent counsel. Okay. Thank you. Now in this case, in addition to denying asylum and withholding on the basis of adverse credibility, there was the alternative ground that the petitioner had not carried his burden of proof. And I think this turns on the question of, according to him anyway, he was exposed to lots of threats, but no harm ever followed. This was true before he left in September 91. He returned for about six months, 91, 92, still no harm. His wife went back on a number of trips, still no harm. Those trips are mentioned in the record at 158 to 62 and 196. Also the immigration judge mentioned that the shining calf has lost strength and there was evidence about that in the record at 252. Also the petitioner testified that he had no knowledge of anybody else who served at Ayacucho being identified or singled out by the shining calf. That's at 155. And he also testified that his wife's parents were still living in their house in Peru without any harm. That's at 153. Counsel, what about the Canales case, Canales-Vargas v. Gonzales? Are you familiar with that case? Not off the top of my head, Your Honor. Then I won't ask. Sorry. So in summary, the evidence here does not compel any conclusion that's contrary to the board. The material inconsistency is sufficient for the adverse credibility finding, and there's also substantial evidence that the petitioner is not in danger even if he was found to be credible. There's also no evidence that the government, the Peruvian government, that is, would acquiesce in torture of the petitioner by the shining calf, so his denial of protection under the Convention Against Torture would fail also. Thank you, counsel. Anything further? I'm sorry? Anything further? No, no, Your Honor. Very well. Thank you. The case just argued will be submitted for decision, and the court will hear argument next in Banjo v. Ayers. Did I pronounce that correctly, B-A-N-J-O? Banjo. It is Banjo. Very well.
judges: Block, O'scannlain, Tallman